# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **RICHARD BRAGG,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 5:16-cv-00030-MHH** |
| | } | |
| **HUNTSVILLE CITY BOARD OF EDUCATION,** | } | |
| | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Richard Bragg alleges that defendant Huntsville City Board of Education forced him to retire because of his age in violation of the Age Discrimination in Employment Act (ADEA). Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Board asks the Court to enter summary judgment in in its favor. (Doc. 45). The Board also asks the Court to strike portions of Mr. Bragg's responsive brief and affidavit. (Doc. 59). For the following reasons, the Court denies the Board's motion to strike and enters summary judgment for the Board.

## I.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To demonstrate that there is a genuine

dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "'Genuine disputes [of material fact] are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. For factual issues to be considered genuine, they must have a real basis in the record.'" *Evans v. Books-A-Million*, 762 F.3d 1288, 1294 (11th Cir. 2014) (quoting *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)).

When considering a motion for summary judgment, the Court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). Even if the Court doubts the veracity of the evidence, the Court cannot make credibility determinations of the evidence. *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## II.     FACTUAL AND PROCEDURAL BACKGROUND

Mr. Bragg worked for the Board as a physical education aide at Montview

Elementary School from September 1996 until he retired in February 2015. (Doc. 55-1, p. 2, ¶¶ 3-4). Mr. Bragg assisted in P.E., monitored students before and during breakfast, restrained children when necessary to prevent fights, and participated in safety patrol. (Doc. 47-1, p. 9).

Mr. Bragg was 60 years old and eligible for benefits when he retired after the Board's then-superintendent, Dr. Casey Wardynski, proposed that the Board terminate Mr. Bragg's employment. (Doc. 55-1, p. 3, ¶ 7). Three events in 2014 formed the basis for the proposed termination. Consistent with the summary judgment standard, the Court will present the facts of these and subsequent events in the light most favorable to Mr. Bragg and draw reasonable inferences in his favor.

**A.** **The February 18, 2014 Accusations**

On February 18, 2014, Towana Davis, the principal of Montview Elementary, received notice that a group of fifth grade students had accused Mr. Bragg of inappropriate conduct. (Doc. 47-1, pp. 10, 66). The students accused Mr. Bragg of taunting students; standing in the doorway of the girls' restroom and making snide remarks; threatening students; insulting students; invading students' personal space; bullying students; yelling at students; inappropriately touching students; and inappropriately grabbing students. (Doc. 47-1, p. 66). Mr. Bragg testified that one of the accusers, a fifth grade student, was a "ring leader[] going

around and getting [her] friends to say things." (Doc. 47-1, p. 10). An accusing student's parent told the student to not say things just because her friends were saying them. (Doc. 47-1, p. 10).

Ms. Davis "spent the day investigating the accusations." (Doc. 47-1, p. 64). She first met with the students to hear their complaint. (Doc. 47-1, p. 65). Then she met with Mr. Bragg. (Doc. 47-1, p. 65). At the meeting, Mr. Bragg denied the accusations. (Doc. 47-1, pp. 10-11). Ms. Davis instructed Mr. Bragg to be careful and to keep his hands off students, and she asked him to prepare a written response to the students' accusations. (Doc. 47-1, p. 12, tr. p. 42; Doc. 47-1, p. 65). Mr. Bragg indicated that it would be difficult to never touch a student because he was "the restraint person at the school," meaning he was trained by the school to restrain students from fighting. (Doc. 47-1, p. 12, tr. p. 42). Even after the allegations of inappropriate touching, school officials still called Mr. Bragg to "handle children that were out of line in classes or in the hall." (Doc. 47-1, p. 12, tr. p. 42).

After Ms. Davis met with Mr. Bragg, she met with a physical education teacher, Mark Wilkins, and she again "met with the students collectively and gave them an opportunity to tell their side of the story" and "share any further information." (Doc. 47-1, p. 65).

Mr. Bragg submitted his written response to the allegations. He stated:

Taunting of students []has never happened.  They talk back to other adults as well as myself.  I correct them, but they talk back or make remarks.  I have only stood outside the bathrooms[] when I have been told to because they are misbehaving.  I have never in my 18 years threatened a student, other than saying I will call a parent or tell someone.  Insulting students has never happened.  I have told children that in [the] past kids did not talk back or disrespect any adults.

Invading personal space only has happened when I had to get in a child['s] face to get attention.

Bullying has not happened-yelling is my last thing I turn to.  Yelling is when class is loud.

Touching has NEVER happened to any children [in 18 years, and these accusations have never happened].

I would be more than glad to talk []to any student and their parents.

[I am] a strong disciplinarian, but [everything] is false accusations.

(Doc. 47-1, p. 67).

At his deposition, when asked about the February 2014 allegations, Mr. Bragg testified that he never taunted, threatened, insulted, bullied, inappropriately touched or grabbed, or invaded the personal space of students.  (Doc. 47-1, pp. 10-11).  Mr. Bragg testified that he stood outside the girls' bathroom only because some girls had been fighting in the bathroom, and Ms. Davis asked him and another teacher, Amy Clark, to stand outside the bathroom and make sure the students got to class without fighting.  (Doc. 47-1, pp. 9-10).  Mr. Bragg testified that he never yelled at a student unless he had to "get over the noise . . . in a gym" and acknowledged that his voice might come across as harsh because he is a coach.

(Doc. 47-1, p. 11). Mr. Bragg testified that he grabbed students only when he had to restrain a student from a fight or "anything where a child had to be restrained." (Doc. 47-1, p. 11).

Mr. Bragg suspected that the students might have told "untruths" about him because Mr. Bragg previously had disciplined the students. (Doc. 47-1, p. 15). As an aide, Mr. Bragg sometimes had to monitor classes, during which he had to tell students to pay attention to the teacher. (Doc. 47-1, p. 15). He also had to supervise students in the morning before the cafeteria opened and make sure things ran smoothly during breakfast. (Doc. 47-1, p. 16). According to Mr. Bragg, the students who complained about him all had past behavior problems. (Doc. 47-1, p. 15, tr. p. 56). The same students had also accused Ms. Clark of being mean to them and calling them names. (Doc. 47-1, p. 16, tr. p. 57).

At the end of the day, Ms. Davis sent a letter to Helen Scott, the Board's director of instruction. (Doc. 47-1, p. 64). In the letter, Ms. Davis questioned the credibility of the students' accusations:

> I wanted to let you know that I have spent the day investigating the accusations made by my 5th grade students against Mr. Richard Bragg (PE instructional aide). Not only did I speak with the students, but I also held conversations with Mr. Mark Wilkins and Mr. Richard Bragg. I felt compelled to share with you my personal feelings regarding the entire situation. Although some of the minor accusations may contain an "ounce" of truth, it is accurate to say that the majority of the students making the accusations have previously voiced their strong dislike for Coach Bragg. Additionally, these students have a strong dislike for any authority figure who attempts to

instill respectful behavior. Also, it should also be noted that these students [have] chronic behavior problems.

(Doc. 47-1, p. 64). Ms. Davis testified that she wrote this "because the students often complained about him for minor -- whatever. And so I just wanted [Ms. Scott] to make sure that when she received all of this information that she knew that there was a possibility that some things may have been said because they did not like him." (Doc. 47-3, p. 9).

Mr. Bragg feels that Ms. Davis's letter "stated basically that [he] didn't do anything." (Doc. 47-1, p. 12, tr. p. 41). Dr. Wardynski testified that the letter shows Ms. Davis "discounted [the students'] opinions." (Doc. 47-2, p. 13). No formal reprimand or disciplinary action came of the allegations.

## B.    The April 1, 2014 Incident

On April 1, 2014, while Mr. Bragg was walking through the lunchroom, he saw a female student about to start a fight with a young man. (Doc. 47-1, pp. 13, 68). Mr. Bragg "kind of tugged on her hood" and told her to turn around. (Doc. 47-1, p. 13). The student said, "get your damn hands off me." (Doc. 47-1, p. 13, tr. p. 48). Mr. Bragg told her, "wait a minute. I'm an adult. All I'm trying to do is help you stay out of trouble." (Doc. 47-1, p. 13, tr. p. 48). Mr. Bragg then told the student's teacher to watch her because she was about to get into a fight. (Doc. 47-1, p. 13, tr. p. 48).

Soon afterwards, the student met with Ms. Davis and wrote a statement

about the incident. (Doc. 47-1, pp. 14, 69). The student wrote that Mr. Bragg grabbed her hoodie, put his hand on her stomach, grabbed her arm tightly, pulled her to his pants, and would not let go of her when she tried to pull herself up. (Doc. 47-1, p. 69). Ms. Davis took notes of a conversation she had with the student later that day. (Doc. 47-3, p. 11, tr. p. 40). Ms. Davis wrote that the student said that she felt uncomfortable and that Mr. Bragg pulled her hoodie, grabbed her arm and stomach, and pulled her towards his "private area." (Doc. 47-1, p. 69).

Ms. Davis spoke with the student's mother about the incident. (Doc. 47-1, pp. 14, 69). Ms. Davis wrote that the student's mother said that the student complained about Mr. Bragg all year for screaming and yelling for no reason and that the student was scared of Mr. Bragg and afraid of repercussions for reporting him. (Doc. 47-1, p. 69).

Mr. Bragg met with Ms. Davis and denied that he rubbed the student against his groin. (Doc. 47-1, p. 14, tr. p. 49). Mr. Bragg wrote a statement about the incident:

> . . . I could tell she was mad, so I gently tugged on her jacket. She jerked and said "get your damn hands off of me." At that time I reached and touched her arm and told her wait a minute you are acting up with the wrong person. I am just trying to keep you out of trouble. She continued at which I tried to tell her the wrong child will knock her out. She used to be a member of school safety patrol. She changed this year.

Ms. Donna Walker and I have tried to speak to her and she has said we don't know her, because she is bad.

I have never hurt her at any time and I was trying to keep her out of trouble.

(Doc. 47-1, p. 68).

The student was one of Mr. Bragg's accusers in February 2014. (Doc. 47-1, p. 13, tr. p. 47). According to Mr. Bragg, the student previously made up a story about Ms. Walker. (Doc. 47-1, p. 15, tr. p. 55).

At a meeting on April 3, 2014, Ms. Davis told Mr. Bragg to be careful about touching children and invading their private space. (Doc. 47-1, p. 14, tr. p. 52). Mr. Bragg told Ms. Davis that he would not touch children in a restraining manner, but after the meeting, he still was called on to discipline misbehaving students. (Doc. 47-1, p. 14, tr. p. 52).

At the meeting, Ms. Davis gave Mr. Bragg a formal reprimand memo. (Doc. 47-1, pp. 14, 56). In the memo, Ms. Davis mentioned that she informed Mr. Bragg that the February 2014 allegations were serious claims that may warrant district level disciplinary actions. (Doc. 47-1, p. 56). Ms. Davis stated that she was "greatly concerned that these accusations have reoccurred since our last meeting. I was very direct when stating that you must maintain a 'hands off approach' with respect to all children." (Doc. 47-1, p. 56). Ms. Davis reprimanded Mr. Bragg for "fail[ing] to adhere to directives from this office." (Doc. 47-1, p. 56).

On April 15, 2014, Mr. Bragg sent to Ms. Davis and the Board's compliance director, Belinda Williams, a response to the reprimand because he felt "that some facts should be addressed."  (Doc. 47-1, p. 72).  In the letter, Mr. Bragg stated:

> . . .  I have tried to help our students excel in class as well as in life.  In return all I have asked for is children to have respect for ALL adults and to behave in an age appropriate manner.
>
> As to the accusations on February 18th and April 1st, it has been proven that I did none of the things I was accused of.  I am strict in my methods as I have been for 18 years but have always had the students' best interests at heart.  These past two years we have seen, by far, the worst behavior out of our students.  I am constantly cursed at, told to shut up, talked back to and the list could go on.  I feel most of the children want some form of discipline because they lack it in the home.  There is no accountability for the parents.
>
> In my opinion having a reprimand put in my file is unjust because the accusations were not substantiated.  I have always followed the directives and procedures.  I will however maintain a "hands off approach" for the rest of my tenure.

(Doc. 47-1, pp. 70-72).

## C.    The August 7, 2014 Incident

On August 7, 2014, a surveillance video camera captured an incident involving Mr. Bragg.  The incident occurred a fair distance from the camera.  The footage is blurry and is not accompanied by audio.[1]

The video shows Mr. Bragg walking in a hall after P.E. class.  Several

---

[1] The Board placed in the record an unedited video of the incident, (Doc. 47-1, Ex. 6), and four edited videos of the incident that blurred the faces of the other students in the hallway and zoomed in to focus on the incident.  (Doc. 47-12, Ex. 2).  Keith Ward, the director of communications and ETV for the Board, produced the edited videos only for the present litigation and provided the videos only to the Board's attorney.  (Doc. 47-12, p. 5, ¶ 11).

students are lined up against the wall in the hallway and a few students are waiting in line for the water fountain. (Doc. 47-1, Ex. 6; s*ee* Doc. 55-2, pp. 2-15). A teacher, Irene Moore-Smith, stood beside the water fountain and witnessed the incident. (Doc. 47-1, Ex. 6; Doc. 47-4, p. 6; s*ee* Doc. 55-2, pp. 2-15). Mr. Bragg approached a female student standing in line for the water fountain from behind. (Doc. 47-12, Ex. 2, Video 4, 00:06-00:17).[2] Mr. Bragg placed his hands somewhere near the student's neck or shoulders -- the video does not show exactly where or how Mr. Bragg positioned his hands. (Doc. 47-12, Ex. 2, Video 4, 00:18-00:19). Mr. Bragg bent down slightly. (Doc. 47-12, Ex. 2, Video 4, 00:21-00:22). The student placed her hands somewhere near Mr. Bragg's arms or hands -- the video does not show exactly where she put her hands. (Doc. 47-12, Ex. 2, Video 4, 00:21). Mr. Bragg lifted the student a short distance off of the ground (the bottom of the student's shoes reached just above Mr. Bragg's ankles) and set her back down approximately one second later. (Doc. 47-12, Ex. 2, Video 4, 00:22-00:23). Mr. Bragg pulled the student in closer to him and hugged her from behind. (Doc. 47-12, Ex. 2, Video 4, 00:24). Mr. Bragg briefly leaned the student from side to side. (Doc. 47-12, Ex. 2, Video 4, 00:25-00:27). Mr. Bragg began to step away from the student, but then leaned back down over the student. (Doc. 47-12, Ex. 2, Video 4, 00:28-00:29). Mr. Bragg stepped his left leg back and created space

_____

[2] "HCBOE (Bragg) 188 Edit FERPA Montview Security video 4" ("Video 4") (Doc. 47-1, Ex. 2) is zoomed in the most and provides the clearest view of the incident.

between himself and the student.  (Doc. 47-12, Ex. 2, Video 4, 00:30).  Mr. Bragg pulled something out of the student's hair.  (Doc. 47-12, Ex. 2, Video 4, 00:30-00:33).  Mr. Bragg then walked away.  (Doc. 47-12, Ex. 2, Video 4, 00:34-00:35).  Neither the student nor Ms. Moore-Smith reacted in any way.

Later that day, Ms. Moore-Smith brought the student to the school nurse, Susan Benfield.  (Doc. 47-4, p. 11).  On an office visit report dated August 7, 2014, Ms. Benfield wrote, "[Ms.] Moore-Smith brought [the student] to the clinic after PE and stated, 'I was at PE and saw Coach Bragg pick [the student] up by the neck, and [the student] is complaining that her neck hurts and you can see a red mark on her neck.' [The student] states, 'Coach Bragg is mean.'"  (Doc. 47-1, p. 61).  Ms. Moore-Smith was not in the room when Ms. Benfield had a conversation with the student.  (Doc. 47-4, p. 11).  Ms. Benfield noted that the student had a small area of red skin on the front right side of her neck, a small scratch on the front or left side of her neck, and scant bleeding.  (Doc. 47-1, p. 61).  Ms. Benfield cleaned the scratch with soap and water and applied a Band-Aid.  (Doc. 47-1, p. 61).  Ms. Benfield reported that the student could rotate her neck without pain.  (Doc. 47-1, p. 61).

Ms. Benfield suggested that Ms. Moore-Smith write a statement documenting the incident.  (Doc. 47-1, p. 61).  Ms. Benfield took the student to Ms. Davis's office.  (Doc. 47-1, p. 61).  Ms. Benfield notified the student's parents.

(Doc. 47-1, pp. 61-62). The student's mother informed Ms. Benfield that the student had been seeing a doctor for the past 9 to 12 months because of neck issues. (Doc. 47-1, p. 63). According to her mother, the student's neck would stiffen at times and doctors could not pinpoint the problem with an MRI. (Doc. 47-1, p. 63). The student's mother told Ms. Benfield that the student knew Mr. Bragg "from last year" and that she knew Mr. Bragg "would not maliciously hurt [the student]." (Doc. 47-1, p. 63). The student returned to class later that day. (Doc. 47-1, p. 63).

On the day of the incident, Mr. Bragg wrote a statement:

> I was leaving gym and a 2nd grade class was getting water. I casually walked up, laughing, and said a little girl was mean and I put my hands around her neck carefully and laughed and said she is one of the best. As I was pulling away, my whistle stuck and pulled her hair. I untangled and apologized and walked off.

> The child is a very sweet child. I talk to [her] grandparents all the time about how sweet she is. I have had 6 principals in 19 years. They will all tell I am a good employee.

> I am a father and grandfather, I would never hurt a child on purpose. I don't like being accused of things so much in [the] last 2 [] years. I have always taken pride in being a good parent, coach and teacher. I try to make all children and parents feel comfortable. I would like to continue until retiring.

(Doc. 47-14, p. 9).

Ms. Moore-Smith submitted an incident report the following morning. (Doc. 47-4, p. 16). In the report, she stated:

> Coach Bragg exited the gym and stopped behind [the student]. He placed both hands on her shoulders and jokingly said, "[t]his is the worst student in your class." I smiled back and said, "[n]ope, she's one of the good ones." He then quickly moved his hands from her shoulders and proceeded to playfully pick [the student] up by the neck. He then put her down and walked away. [The student] looked upset. I asked her if she was okay. She had one of her hands on her neck and said, "[n]o my neck hurts."

(Doc. 47-4, p. 16).

On August 8, 2014, Ms. Davis gave Mr. Bragg a formal written reprimand for the incident. (Doc. 47-3, p. 48). In the reprimand memo, Ms. Davis wrote, "[u]pon viewing the video, it was clearly evident that the child was lifted from the floor via your efforts. The student's mother is demanding that disciplinary actions be taken against you. Based on previous documentations (see attached), you have been advised on multiple occasions to adhere to our 'no touch' policy." (Doc. 47-3, p. 48).

On August 11, 2014, Mr. Bragg wrote another statement about the incident:

> [O]n August 7[,] as I walked by a class getting water, in a laughing and kidding manner I causally said a child was mean laughing and playing, whole time. I then hugged child and put my hands around her neck [again playing] and I said I will pick you up by [the] neck. As I hugged her, my whistle got stuck in her hair. I apologized to her and got [the] whistle out of her hair. I was not mad or anything. I feel bad, because this is a very good child, since kindergarten. I play and look out for her, always. Her past teachers can testify to all that.
>
> I have 2 sons on HPD, and 2 granddaughters and I am a good father, grandfather, teacher and coach to each and every one. I have always been a hands on person and I have only gave children affection and care.

In regard to the two accusations from last year, the staff investigated and found both accusations from last year were false. Coach Wilkins, who was [the] PE teacher at the time[,] will verify that the 5th grade was after me. They did not like being told what to do, therefore they said things that were not true.

. . . I have done nothing wrong. I just want to finish my career. I love and enjoy teaching and coaching. . . . I feel good when I see or hear things happening when they get older. I enjoy seeing children grow and develop.

(Doc. 47-1, p. 78).

That day, Mr. Bragg requested via email a meeting with Ms. Davis, the Board's deputy superintendent, Dr. Barbara Cooper, and the Board's director of elementary education, Dr. Cathy Vasile, because he did "not want [his] reputation ruined" and "want[ed] things worked out." (Doc. 47-1, p. 80). Because his email could not reach Dr. Vasile, Mr. Bragg sent his request via email again to Ms. Davis. (Doc. 47-1, p. 79). In his email, Mr. Bragg stated:

I have always prided myself in being a good teacher. I may not be certified, but everyone in the past has depended and counted on me. Now, I feel like I have wasted 18 years. I am a good parent/grandparent/teacher and coach. I feel all this is ruining my reputation and I am very upset and I do not feel you have my back, like I have yours and everyone I have worked with or for.

I worked for [five previous principals] and I felt like what I do is important. I don't feel that way anymore. I could have transferred if I did not like it here. However, I have always liked students to come back and visit. I like seeing good stories about past students. They usually tell me what all is going on in their life, whether it be family, school, work. I understand that in all these years, some people dislike me, but I always keep children in my mind. This is why, I feel all this

is uncalled for. God knows, I never did this for the money, but it is for kids. I want to discuss with Dr. Cooper. I do not want to transfer, but if that is what I need to do, I will. I don't like worrying about little stuff.

(Doc. 47-1, p. 79).

Mr. Bragg, Ms. Davis, and Dr. Vasile met on August 25, 2014. (Doc. 47-1, p. 83). Mr. Bragg sent Ms. Davis and Dr. Vasile an email after the meeting:

. . . I still do not feel write ups belong in my human resource file. I am very aware that what I did in August 7, 2014 was not very professional. [I am truly sorry] I would never hurt any child on purpose. I have been a good employee since 1996 and last couple years since I came back from cancer has been worse.[3] I was one selected for restraint training, so I am very aware what and how to handle all children. I have always been the one to help with discipline until now, so I will be assistant.

From 1996 until 2014 I was not treated like aide. However, yall made it clear yesterday that I am P.E. assistant, so I will do what teacher tells me. I am a grown man trying to make things better for these children.

(Doc. 47-1, p. 83).

On September 17, 2014, Ms. Williams interviewed Mr. Bragg. (Doc. 47-1, p. 84). Ms. Williams took notes of the interview. According to the notes, Mr. Bragg told Ms. Williams that he was "teasing and playing" with the girl and hugged her with his hands around her neck. (Doc. 47-1, p. 84). He joked that he would pick her up by the neck, and then his badge and whistle got stuck in the girl's hair. (Doc. 47-1, p. 84). Mr. Bragg explained to the girl's grandmother what

---

[3] At the time, Mr. Bragg had stage IV throat and brain cancer. (Doc. 47-1, p. 7).

happened. Mr. Bragg said the grandmother was fine, he apologized, and the girl gave Mr. Bragg "a big hug in front of the grandmother." (Doc. 47-1, p. 84). Mr. Bragg said he would not hurt any child, much less this particular student because she was so fragile. (Doc. 47-1, p. 84).

Mr. Bragg explained that Ms. Davis had instructed him to stand near the girls' bathroom earlier in the year and that he had grabbed the student in April to stop her from fighting. (Doc. 47-1, pp. 84-85). He said that he had no idea why people were saying that he is touching girls, that he had not squeezed or grabbed anybody's arm, and that he does not know why students feel uncomfortable around him. (Doc. 47-1, p. 85). Mr. Bragg told Ms. Williams that he did not pick the girl up. (Doc. 47-1, p. 84). Mr. Bragg told Ms. Williams this because he did not know whether he did or not because he was playing and he had not seen the video at that time. (Doc. 47-1, p. 23).

In September 2014, Mr. Bragg was reassigned to the warehouse at the school. (Doc. 47-1, p. 28). Mr. Bragg performed manual labor at the warehouse. (Doc. 47-1, p. 28). Among other duties, he loaded and unloaded trucks, stocked shelves, and packaged materials for custodians. (Doc. 47-1, p. 28).

Meanwhile, the Madison County Department of Human Resources (DHR) investigated the incident at the water fountain. (Doc. 55-1, pp. 44-53). DHR concluded its investigation on September 2, 2014. (Doc. 55-1, p. 48). According

to the DHR administrative law judge, following the investigation, "[r]ather than offering Mr. Bragg an administrative hearing he was offered an administrative record review, resulting in a substantial delay (until 2016) in the matter being referred to the Office of Administrative Hearing for the scheduling of a hearing." (Doc. 55-1, p. 48).  Sometime in 2016, the administrative law judge conducted a hearing at which Mr. Bragg and Ms. Davis testified.  (*See* Doc. 55-1, pp. 46-48).

On December 19, 2016, the administrative law judge entered his final decision and concluded that Mr. Bragg did not abuse or neglect the student.  (Doc. 55-1, p. 53).  The judge found:

> The evidence in this case established that Mr. Bragg, who was quite fond of [the student], playfully and briefly picked her up and then set her back down on the floor.  The evidence and the video did not establish any discomfort, distress or injury to [the student] as a result of this incident.  Rather [the student], who appeared unfazed, remained on the line to the water fountain and drank from the fountain when it was her turn.
>
> Certainly Mr. Bragg's actions in picking [the student] up reflect poor judgment on his part.  However, no evidence suggests that he intended to in any way harm [the student] nor did the evidence establish that he did harm [the student].  Therefore, I find that his actions do not rise to the level of child abuse.

(Doc. 55-1, pp. 48-49).

### D.     The Proposed Termination

On September 25, 2014, Dr. Wardynski sent Mr. Bragg a written notice of proposed termination.  (Doc. 47-1, pp. 49-52).  In the notice, Dr. Wardynski stated

that he was proposing termination to the Board because Mr. Bragg touched female students inappropriately; continued to touch and grab students after being directed not to do so by Ms. Davis; continued to touch and grab students after promising to Ms. Davis that he would not do so; treated students in an insulting, disrespectful, and threatening manner; and lied to his supervisor about his actions. (Doc. 47-1, p. 49). Dr. Wardynski cited as specific examples of improper conduct the February 18, April 1, and August 7, 2014 incidents. (Doc. 47-1, p. 50). Dr. Wardynski also noted that Mr. Bragg lied to Ms. Davis and Ms. Williams about lifting the student off of the ground. (Doc. 47-1, p. 51).

Mr. Bragg contested the proposed termination. (Doc. 47-1, p. 86). Mr. Bragg sent Dr. Wardynski an email in which Mr. Bragg stated:

> I have worked at Montview since 1996 and I have always tried to be a good employee. The incident they say happened on [August] 7, 2014 I took credit for. I was only playing with the student. All the accusations last school year are far from the truth. I am sending this because it makes me look bad and I am not. If someone will talk to my current staff plus any former coworkers. They can talk to parents and students and they will attest. Some of these parents were former students.
>
> I have it being handled, but I am nowhere near like this. I will not get your email because the school or HCS closed my email. Also, I have been involved with children since 1978 when I first coached.
>
> I have always looked out for these students as well as any child.
>
> I am writing because this really bothers me . . .
>
> Please look into things at Montview.

(Doc. 47-1, p. 89).

On September 26, 2014, a local news station published a story titled, "Montview Elementary School teacher recommended for termination after picking student up by her neck." (Doc. 47-1, p. 87). The story included excerpts of the August 8, 2014 reprimand memo from Ms. Davis and quotes from the mother of the student who Mr. Bragg lifted. (Doc. 47-1, p. 88). The news station did not contact Mr. Bragg for a comment. (Doc. 47-1, p. 24). Mr. Bragg does not know who reported the story to the news station, but according to Mr. Bragg, Ms. Davis's daughter worked at the news station. (Doc. 47-1, p. 24).

Through his attorney, Mr. Bragg requested a hearing on the proposed termination. (Doc. 47-1, p. 94). Pursuant to the Alabama Students First Act, Mr. Bragg, as a tenured employee, was entitled to a hearing on his proposed termination at which he could "present testimony, other evidence, and argument on matters relevant to the proposed termination and [] cross-examine witnesses whose testimony is proffered in support of the proposed termination." Ala. Code § 16-24C-6(c). Mr. Bragg's attorney asked Dr. Wardynski to provide several pieces of evidence regarding the proposed termination. (Doc. 47-1, pp. 91-93). Dr. Wardynski notified Mr. Bragg that the hearing was set for December 9, 2014. (Doc. 47-1, p. 95).

According to Mr. Bragg, Ms. Williams advised him to "just go ahead and

resign instead of fighting [the proposed termination]" and to "[g]o ahead and resign because that's what most people do [] in your situation." (Doc. 47-1, p. 26, tr. pp. 97-98). Mr. Bragg testified that a Board member, Topper Birney, told Mr. Bragg that the Board would do whatever Dr. Wardynski proposed. (Doc. 47-1, p. 26). According to Mr. Bragg, at a Christmas party at the school warehouse, he mentioned his proposed termination to another Board member, Laurie McCauley, and Ms. McCauley said "whatever Dr. Wardynski recommended." (Doc. 47-1, p. 26). Mr. Bragg took this to mean that the Board would take whatever action Dr. Wardynski recommended with respect to his (Mr. Bragg's) proposed termination. (Doc. 47-1, p. 27).

According to Mr. Bragg, Ms. Williams informed him that he would not keep his health insurance benefits if he was terminated, but that he would retain his benefits if he retired instead. (Doc. 47-1, p. 27). Mr. Bragg needed his health insurance for his cancer treatment. (Doc. 47-1, p. 27). Therefore, on December 9, 2014, the day of the hearing, Mr. Bragg notified Dr. Wardynski that he would retire at the end of January 2015. (Doc. 47-1, p. 96). Accordingly, the Board did not hold a hearing on the proposed termination. (Doc. 47-1, p. 25).

Mr. Bragg remained employed until he retired on February 1, 2015. (Doc. 47-1, pp. 27, 97). Afterwards, Stephanie Burris, who was 32 years old at the time, began performing Mr. Bragg's physical education aide duties. (Doc. 55-4, p. 2, ¶

3).

### E. **Mr. Bragg's Lawsuit**

On March 13, 2015, Mr. Bragg filed a charge of discrimination with the EEOC. (Doc. 47-1, pp. 98-99). In the charge, Mr. Bragg alleged that he was recommended for termination because of unlawful age discrimination. (Doc. 47-1, p. 98). The EEOC was unable to conclude that the Board committed age discrimination and sent Mr. Bragg a right to sue letter on October 1, 2015. (Doc. 47-1, p. 102).

On January 6, 2016, Mr. Bragg filed his complaint in this Court. (Doc. 1). In his initial complaint, Mr. Bragg asserted an ADEA disparate treatment claim against the Board and two § 1983 claims against several other defendants. (Doc. 1, pp. 4-5). Mr. Bragg abandoned one § 1983 claim, and the Court dismissed the other. (*See* Docs. 21, 30). In his amended complaint, Mr. Bragg alleges that Dr. Wardynski proposed terminating him because of his age, and the Board therefore violated the ADEA. (Doc. 21, pp. 2-5). The Board contends that Mr. Bragg has not created a genuine issue of material fact on his ADEA claim. (Doc. 45).

## III. ANALYSIS

### A. **The Board's Motion to Strike**

The Board asks the Court to strike parts of Mr. Bragg's affidavit and parts of his brief in response to the Board's motion for summary judgment. (Doc. 59, pp.

1-3).  The Board should have raised its objections in its reply brief because the objections concern evidence on which Mr. Bragg relies.  The Court construes the Board's motion to strike as an objection to evidence under Rule 56(c)(2) of the Federal Rules of Civil Procedure.  *See Taylor v. City of Gadsden*, 958 F. Supp. 2d 1287, 1291 (N.D. Ala. 2013), *aff'd*, 767 F.3d 1124 (11th Cir. 2014) (treating motion to strike as an objection).[4]

Rule 56(c)(2) enables a party to submit evidence that ultimately will be admissible at trial in an inadmissible form at the summary judgment stage.  Under the rule, a district court may, for example, "consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form."  *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)).  A district court has broad discretion to determine at the summary judgment stage what evidence it will consider pursuant to Rule 56(c)(2).  *See Green v. City of Northport*, 2014 WL 1338106, at *1 (N.D. Ala.

---

[4] Effective December 1, 2010, motions to strike summary judgment evidence no longer are appropriate.  *See* Fed. R. Civ. P. 56(c)(2) advisory committee note (2010 amendments) ("There is no need to make a separate motion to strike."); *Campbell v. Shinseki*, 546 Fed. Appx. 874, 879 (11th Cir. 2013) ("The plain meaning of [amended Rule 56(c)(2)] show[s] that objecting to the admissibility of evidence supporting a summary judgment motion is now a part of summary judgment procedure, rather than a separate motion to be handled preliminarily . . . ."). Pursuant to Federal Rule of Civil Procedure 56(c)(2), at the summary judgment stage, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Accordingly, objections to evidence supporting or opposing a motion for summary judgment should be made in the objecting party's brief.

March 31, 2014).

The Board asks the Court to strike from Mr. Bragg's affidavit his statement that he lifted the student by her arms after she grabbed his arms. (Doc. 55-1, p. 3, ¶ 8; Doc. 59, pp. 7-8). The Board argues that the statement "is inadmissible because it conflicts with his previous deposition testimony." (Doc. 59, p. 3, ¶ 8). The Board notes that Mr. Bragg testified at his deposition that he "lifted the child up by her shoulder." (Doc. 59, p. 2, ¶ 7) (citing Doc. 47-1, pp. 65-66, 85-86). Mr. Bragg's affidavit testimony concerns what he believes the security video footage shows. (Doc. 55-1, p. 3, ¶ 8) ("The video depicts me . . . lifting the girl with her holding on to my arms . . . ."). The Court will consider Mr. Bragg's interpretation of the video.

Beyond the affidavit, the Board asks the Court to strike from Mr. Bragg's responsive brief the statements: "Later [on August 7, 2014], Moore[-Smith] told Bragg that she had been forced to write a witness statement about the incident by Towana Davis and that he was being watched"; and "Bragg testified that Irene Moore[-]Smith told him that Towana Davis instructed her to write a statement about the incident because [the allegation that Mr. Bragg picked the student up by her neck] was false." (Doc. 54, pp. 9, 24; Doc. 59, pp. 1-2, ¶¶ 3-4). The Board argues that the statements are inadmissible hearsay and not supported by Ms. Moore-Smith's or Mr. Bragg's deposition testimony. (Doc. 59, p. 2, ¶¶ 5-6). Mr.

Bragg could avoid a hearsay objection at trial by calling Ms. Moore-Smith as a witness, but the Court has not been able to find support for the statements in the evidentiary record in a deposition, an affidavit, or a declaration. Therefore, the Court will disregard the unsworn statements in its evaluation of the Board's summary judgment motion.

### B.    <u>Mr. Bragg's ADEA Claim</u>

The ADEA prohibits employers from discharging employees who are at least 40 years old because of their age. 29 U.S.C. §§ 623(a)(1), 631(a). When, as here, there is no direct evidence of age discrimination, a plaintiff may rely on circumstantial evidence to establish that he was discharged because of his age. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015). Under the burden-shifting framework in *McDonnell Douglas*, the plaintiff first must establish a prima facie case of age discrimination by showing that: "(1) he was a member of the protected group between the age of forty and seventy; (2) he was subject to an adverse employment action; (3) a substantially younger person filled the position from which he was discharged; and (4) he was qualified to do the job from which he was discharged." *Liebman*, 808 F.3d at 1298 (citing *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012)).

If the plaintiff establishes a prima facie case, then the burden shifts to the

employer to produce evidence of a legitimate, non-discriminatory reason for the challenged action. *Kragor*, 702 F.3d at 1308. The employer satisfies this burden by producing evidence that "raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Kragor*, 702 F.3d at 1308 (internal quotation marks omitted) (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)); *see Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000) ("This burden is one of production, not persuasion.").

If the employer satisfies its burden, then "the burden shifts back to the employee to show that the employer's reason is a pretext." *Liebman*, 808 F.3d at 1298 (citing *Kragor*, 702 F.3d at 1308). "The plaintiff can show pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Kragor*, 702 F.3d at 1308 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). "In other words, the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256, and *McDonnell Douglas*, 411 U.S. at 804). The plaintiff may establish pretext with "a convincing mosaic of circumstantial evidence that

would allow a jury to infer intentional discrimination by the decisionmaker." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (citations and internal quotation marks omitted).

Because Mr. Bragg was 60 years old at the time of the alleged adverse employment action, he has satisfied the first element of his prima facie case. Because Ms. Burris was 32 years old when she took over Mr. Bragg's duties, Mr. Bragg has satisfied the third element of his prima facie case. Because Mr. Bragg worked as a physical education aide for 19 years and the qualifications for the position did not change, Mr. Bragg has satisfied the fourth element of his prima facie case. The Board challenges Mr. Bragg's ability to establish the second element of his prima facie case, namely that he was subjected to an adverse employment action.

The Eleventh Circuit has "long recognized that constructive discharge can qualify as an adverse employment decision under ADEA." *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1230 (11th Cir. 2001) (citations omitted). "The threshold for establishing constructive discharge in violation of ADEA is quite high. . . . To successfully claim constructive discharge, a plaintiff must demonstrate that working conditions were so intolerable that a reasonable person in [his] position would have been compelled to resign." *Hipp*, 252 F.3d at 1231 (internal quotation marks omitted) (citing *Poole v. Country Club of Columbus,*

*Inc.*, 129 F.3d 551, 553 (11th Cir. 1997)); *see also Rowell v. BellSouth Corp.*, 433 F.3d 794, 806-07 (11th Cir. 2005) ("Because Rowell was not faced with an impermissible take-it-or-leave-it choice between retirement or discharge, we find that he cannot establish an adverse employment action of constructive discharge . . . ."). "The fact that one of the possible outcomes is that [the plaintiff] would lose his job alone is not sufficient to establish the intolerable conditions sufficient to justify a finding of constructive discharge . . . ." *Rowell*, 433 F.3d at 806. "The standard for proving constructive discharge is higher than the standard for proving a hostile work environment." *Hipp*, 252 F.3d at 1231 (citing *Landgraf v. USI Film Prod.*, 968 F.2d 427, 430 (5th Cir. 1992), *aff'd*, 511 U.S. 244 (1994)). This is an objective standard and courts "do not consider the plaintiff's subjective feelings." *Hipp*, 252 F.3d at 1231.

An involuntary resignation may constitute a constructive discharge. *Morgan v. Ford*, 6 F.3d 750, 755 (11th Cir. 1993). "An employee's resignation will be deemed involuntary where the employer (1) forces the resignation by coercion or duress, or (2) obtains the resignation by deceiving or misrepresenting a material fact to the employee." *Ross v. City of Perry, Ga.*, 396 Fed. Appx. 668, 670 (11th Cir. 2010) (citing *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995)). An employer forces resignation by coercion or duress when, "under the totality of the circumstances, the employer's conduct in obtaining the employee's

resignation deprived the employee of free will in choosing to resign." *Hargray*, 57 F.3d at 1568. An employer obtains resignation by deceit or misrepresentation if the employer mispresents a material fact concerning the resignation, and the employee reasonably relies on the misrepresentation. *Id.* at 1570.

Mr. Bragg argues that his resignation was involuntary and he was constructively discharged because he "was informed that he might be discharged with a consequent loss of retirement benefits," "suffered an intolerable change in job duties with a loss in pay," and resigned because of "coercion, duress[,] and misrepresentation." (Doc. 54, pp. 17, 19). Mr. Bragg compares himself to the plaintiff in *Downey v. S. Nat. Gas Co.*, 649 F.2d 302 (5th Cir. Unit B June 1981), an opinion that is binding precedent. (Doc. 54, pp. 17-18).[5] In *Downey*, the plaintiff, a 61-year-old employee, sought transfer to a new position, but his employer gave the position to a much younger employee with much less experience. The plaintiff was told that he was not selected because of his advanced age, that the company had nothing else for him to do, that he was in danger of being discharged because the company did not want to keep him around until the mandatory retirement age of 70, and that he would lose all of his stock benefits if he were discharged. The plaintiff retired early to keep his benefits. He then filed

---

[5] "[D]ecisions of the United States Court of Appeals for the Fifth Circuit (the 'former Fifth' or the 'old Fifth'), as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit . . . ." *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981).

suit under the ADEA, claiming that he had been constructively discharged. (Doc. 47-1, pp. 98-99).

The Fifth Circuit found that "[a] reasonable person might well feel compelled to resign in the face of" the statement "that he might be discharged[] with a consequent loss of benefits." *Downey*, 649 F.2d at 305. Accordingly, the Fifth Circuit held that the plaintiff created "a contested issue of material fact regarding constructive discharge." *Id.*

Mr. Bragg argues that like the plaintiff in *Downey*, he received notice that he potentially was facing termination.

> Then, just as the personnel director in *Downey*, [Ms. Williams] told Bragg that if he were discharged, he would lose his retirement benefits, such as health insurance. And Laurie McCauley, just as the personnel director said in *Downey*, told Bragg that the Board would do whatever Dr. Wardynski proposed—meaning that it was almost certain that the Board would terminate his employment. Finally, like the plaintiff in *Downey*, Richard Bragg resigned rather than face loss of his retirement benefits.

(Doc. 54, pp. 17-18). According to Mr. Bragg, "given the similarities between *Downey* and the instant case, his retirement was involuntary because the possibility of discharge threatened his future well-being. . . . *Downey* compels a conclusion that Richard Bragg has presented a genuine issue of material fact as to constructive discharge." (Doc. 54, pp. 18). The Court disagrees.

As the Eleventh Circuit explained in *Rowell*, *Downey* does not establish that any employee who chooses to resign rather than risk possible termination and a

consequent loss of benefits is constructively discharged.  *Rowell*, 433 F.3d at 805.

Such an employee "may well think that the only reasonable response is to resign

and take the [benefits] package, but the motivation is purely economic."  *Id.*  Mr.

Bragg's situation is not like Mr. Downey's situation, in large part because Mr.

Downey was not facing disciplinary action.  Mr. Downey learned that he was

passed over for a job opening in his company because of his advanced age, and he

was told that he risked losing his job because his company could avoid providing

benefits to him if he lost his job before he reached the mandatory retirement age of

70.  Here, because of his cancer, Mr. Bragg had a strong economic incentive to

choose a path that would enable him to retain his health benefits, but his decision

to resign cannot be characterized as a constructive discharge because Mr. Bragg

had the option of remaining in his job and challenging his notice of proposed

termination.[6]  Because the record clearly demonstrates that Mr. Bragg ignored

repeated instructions to keep his hands off students, his decision to forego the

administrative process and opt for his health care benefits seems a wise choice of

an advantage.  Mr. Bragg did not resign and retain his benefits to avoid an

inevitable employment action based solely on his age.  That is the difference

between Mr. Bragg and Mr. Downey.

---

[6] The Alabama Students First Act provides that "[a]n employee who is terminated following a hearing requested by the employee may obtain a review of an adverse decision by filing a written notice of appeal to the State Superintendent of Education within 15 days of receipt of the decision."  Ala. Code § 16-24C-6(e).

Mr. Bragg also argues that the transfer to the warehouse, which he characterizes as "an embarrassing demotion with a loss of pay," constituted "changes to his working conditions [that] were so intolerable that a reasonable person would have felt compelled to resign." (Doc. 54, p. 19). The Court understands that Mr. Bragg was frustrated with his transfer, but Mr. Bragg has not presented evidence demonstrating that the transfer met the high standard for a constructive discharge. Moreover, Mr. Bragg's opinion that "[b]y watching the video, Dr. Wardynski should have known that [the Board] had no real case against Richard Bragg" does not create a genuine issue as to whether his resignation was the product of coercion, duress, and misrepresentation. (Doc. 54, p. 21).

Even if Mr. Bragg had made a prima facie case, Dr. Wardynski had legitimate non-discriminatory reasons for proposing termination, and Mr. Bragg has not shown that these reasons are pretext. The Board's legitimate non-discriminatory reasons are well-stated in the notice of proposed termination. Following an investigation, Dr. Wardynski found that Mr. Bragg: (1) inappropriately touched female students; (2) continued to touch and grab students after being directed not to do so; (3) continued to touch and grab students after promising that he would not do so; (4) treated students in an insulting, disrespectful, and threatening manner; and (5) lied to supervisors when accused of improper conduct. (Doc. 47-1, p. 49). Dr. Wardynski cited as specific examples

for his findings the February 18, April 1, and August 7, 2014 incidents and the incident when Mr. Bragg lied to Ms. Davis and Ms. Williams about lifting the student off of the ground. (Doc. 47-1, pp. 50-51).

Mr. Bragg offers several unpersuasive arguments for pretext. First, Mr. Bragg argues that the Board was dishonest about its reasons for proposing his termination. (Doc. 54, pp. 23, 25). Specifically, Mr. Bragg contends that the Board had no legitimate reason to terminate him because, according to Mr. Bragg, the August 7, 2014 video shows that he did not lift the student by her neck, he could not have injured the student whom he lifted, the February and April 2014 accusations were unsubstantiated, and witness statements against him were the product of an agenda to remove him. (Doc. 54, pp. 22-25).

According to Mr. Bragg, "the still frames from the video demonstrate that [he] did not grab the child by her neck and did not rub the child on his crotch." (Doc. 54, p. 23). Mr. Bragg contends that instead he "picked the child up when the child grabbed his arm, he placed the child back on the ground, hugged her around the neck, and caught his lanyard in her hair," and Dr. Wardynski therefore had no reason to think Mr. Bragg picked the child up by her neck and rubbed her against his groin. (Doc. 54, p. 23).

Reasonable jurors could accept Mr. Bragg's contention that he lifted the student by the arms, but no reasonable juror could doubt that Dr. Wardynski

honestly and reasonably believed that Mr. Bragg lifted the student by her neck. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) ("The inquiry of the ADEA is limited to whether [decisionmakers] *believed* that Elrod was guilty of harassment, and if so, whether this belief was the reason behind Elrod's discharge.") (emphasis in original); *Baker v. Russell Corp.*, 372 Fed. Appx. 917, 920 (11th Cir. 2010) ("Whether an employee actually engaged in the misconduct that was reported to the decision-maker is irrelevant to the issue of whether the decision maker believed that the employee had done wrong.").

The video footage by itself could support Dr. Wardynski's position, but Dr. Wardynski relied on more than the video. He relied also on Ms. Moore-Smith's witness statement that Mr. Bragg lifted the student by the neck, the nurse's report of the student's neck injury, and Mr. Bragg's two written statements in which he stated that he lifted the student by her neck. Dr. Wardynski viewed this evidence in light of the February and April accusations. Even if Dr. Wardynski shared Mr. Bragg's interpretation of the video, discredited the witness statements and the February and April allegations, and doubted the student's injury, he still had reasons to propose Mr. Bragg's termination. Mr. Bragg lied to Ms. Williams about lifting the student when he did in fact lift the student, he had twice before promised that he would take a hands-off approach with students, and he was in fact the subject of similar accusations on two previous occasions.

As mentioned above, Mr. Bragg contends that Ms. Moore-Smith's statement on which Dr. Wardynski relied is false because "[Mr.] Bragg testified that [Ms.] Moore Smith told him that [Ms.] Davis instructed her to write a statement about the incident because [the allegation that he picked the student up by her neck] was false." (Doc. 54, p. 24). The Court cannot locate this testimony. Ms. Davis told Ms. Moore-Smith to write a statement about the incident, (Doc. 47-1, p. 18), but there is nothing unusual about a principal instructing a witness to write a statement following this kind of incident. And there is no evidence in the record to support Mr. Bragg's allegations that Ms. Davis "forced" Ms. Moore-Smith's statement, that Ms. Williams "tried to push the sexual abuse narrative on [Ms. Moore-Smith]," or that "the so-called investigation was conducted with an agenda . . . to find pretext." (Doc. 54, p. 24). These conclusory assertions do not create a genuine issue of fact.

Mr. Bragg also argues that he did not injure the student when he lifted her up because "the video demonstrates no reaction from Irene Moore Smith upon seeing the child picked up. The video shows the child frolicking in the hall after Bragg put her down." (Doc. 54, p. 24). That may be so, and reasonable jurors could agree that Mr. Bragg did not cause the student's injury. But reasonable jurors could not doubt that Dr. Wardynski honestly and reasonably believed that Mr. Bragg injured the student because of the nurse's report detailing the injury and Ms.

Moore-Smith's statement that the child said her neck hurt right after Mr. Bragg lifted her.

Additionally, Mr. Bragg contends that the Board has "made a habit of forcing resignation of workers who have reached retirement age." (Doc. 54, p. 12). To support this conclusory allegation, Mr. Bragg cites to three pages of a 281-page document that lists birthdates and payroll information for 2,513 employees. (Doc. 54, p. 12; Doc. 55-28). According to Mr. Bragg, the document shows that "the vast majority of tenured employees who have been issued a notice of termination are at retirement age." (Doc. 54, p. 12). Mr. Bragg has not explained and the Court cannot locate information in the document concerning forced resignations or notices of termination. Mr. Bragg cites "generally" to this same kind of document from 2013 and 2014 and argues that "the Board has greatly increased the number of employees who are between 20[ and ]35 years of age." (Doc. 54, p. 12; Doc. 55-24; Doc. 55-25). Mr. Bragg has not explained how this data supports his argument or laid "an analytic foundation" for the significance of the date as circumstantial statistical evidence. *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 963 (11th Cir. 1997). Therefore, this data does not support Mr. Bragg's contention that the Board discriminated against him on the basis of his age.

Finally, Mr. Bragg argues that Dr. Wardynski and Ms. Williams "have treated other employees less harshly for similar conduct," particularly Kimberly

Davidson and Anthony Thompson who are both younger than Mr. Bragg. (Doc. 54, pp. 12, 26). The record does not support this argument.

Employees who are "involved in or accused of the same or similar conduct and [] disciplined in different ways" are valid comparators to a plaintiff. *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) (citation and internal quotation marks omitted). The Eleventh Circuit requires that "the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Id.*

Mr. Thompson allegedly cursed at, struck, and shoved a student to the ground, threatened to strike students with a paddle he kept in his office, struck two students with the paddle, was suspended previously for striking a student, and had a history of inappropriate behavior. (Doc. 55-5, pp. 1-3). Mr. Thompson resigned after receiving a notice of proposed termination. (Doc. 47-9, p. 22). Mr. Bragg contends that because the Board only suspended Mr. Thompson when he first struck a student, knew that he struck students with a paddle, and sought termination only after a student brought a complaint, the Board was "tolerant of Thompson but intolerant of Bragg." (Doc. 54, p. 26). But the Board treated Mr. Thompson and Mr. Bragg similarly. When Mr. Thompson first struck a student, the Board gave him a lesser punishment, suspension. When Mr. Bragg was first accused of inappropriate touching, the Board gave him a lesser punishment, a

formal written reprimand. When Mr. Thompson struck a student again, the Board proposed terminating him. When Mr. Bragg inappropriately touched a student again and lifted her off the ground, the Board proposed terminating him. In both cases, the Board sought termination only after the Board disciplined the employee for prior misconduct.

The Board first suspended Ms. Davidson for pushing a student into a wall and causing him to suffer a cut lip, and two years later suspended her for pulling a third grade student by the arm and calling her a "little brat." (Doc. 55-21, p. 2). According to Mr. Bragg, the Board suspended Ms. Davidson for being "malicious," yet sought to terminate Mr. Bragg when he "merely restrained a student and . . . lifted a girl playing with her." (Doc. 54, p. 26). Ms. Davidson's first offense, pushing a student against the wall and causing a cut lip, was severe, but the Board's treatment of Ms. Davidson was consistent with its treatment of Mr. Bragg and Mr. Thompson because the Board administered a lighter punishment for her first offense. Ms. Davidson's second offense, grabbing a student by the arm and calling her a brat, is less severe than the evidence of misconduct on which Dr. Wardynski relied in proposing Mr. Bragg's termination. Therefore, Mr. Bragg has not demonstrated that the Board treated similarly situated employees different because of their age.

The Court recognizes that the school trained and required Mr. Bragg to

restrain children when necessary, and he necessarily had to raise his voice as a coach and P.E. aide. Materials in the record show that students, parents, and supervisors appreciated Mr. Bragg throughout his 19-year tenure at Montview. He clearly did not intend to hurt the child whom he lifted off of the ground. And DHR concluded that he did not engage in child abuse or neglect.

Still, that said, as a matter of law, Mr. Bragg was not constructively discharged under the ADEA. Even if he was, he has not satisfied his burden to show pretext. Even accepting that Mr. Bragg did not lift the student by her neck, that Mr. Bragg did not cause the student's neck injury, and that the February and April allegations are false, Dr. Wardynski still relied on the following objective evidence in proposing Mr. Bragg's termination: Mr. Bragg lifted a student off of the ground; Mr. Bragg had twice before been instructed to maintain a "hands-off" approach to students; he reported in two written statements that he lifted the student by her neck; he lied and said he did not lift the student in his interview with Ms. Williams; Ms. Moore-Smith stated that she witnessed Mr. Bragg lift the student by her neck; and the nurse reported that the student's neck was injured shortly after the incident. Mr. Bragg has not created a convincing mosaic of circumstantial evidence that casts doubt on these reasons for his proposed termination.

## IV.    CONCLUSION

Based on the foregoing, the Court **DENIES** the Board's motion to strike (Doc. 59) and **GRANTS** the Board's motion for summary judgment (Doc. 45). The Court will enter a separate judgment in favor of the Board.

**DONE** and **ORDERED** this September 26, 2018.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE